Good morning. My name is Anne Laverty. I practice in Cedar Rapids, Iowa. I represent Mr. Anthony Hall, Jr. of Cedar Rapids. I'm substitute counsel because Mr. Hall's prior attorney sadly passed away about two months ago. There are a couple of interesting, or if not novel, issues in this case in addition to the Mathis issue. I don't know if the court has any specific questions that come to mind immediately, otherwise I'll just start my discussion. First, the defendant had an interesting path on his way to trial. They prepared a plea agreement, he signed a plea agreement, took a plea, went all the way to the point of having a pre-sentence report come out, and oops, surprise, both the AUSA and defense counsel apparently were misinformed as to whether or not one of Mr. Hall's prior convictions qualified for purposes of the ACCA. And at that point the defendant requested the opportunity to withdraw his plea and go to trial. I apologize, I'll stand closer to the microphone. So Mr. Hall requested to withdraw his plea and go back to trial. He was of course, coming up to the trial, the government wants to use the statements in that plea agreement against him. And the foundation of that is of course language in the plea agreements that is pretty typical, where the defendant is required to waive his rights under Rule 410. The trial judge had a hearing on the matter, is that right? That's correct, that's correct. And on what looks like a fairly well-developed record, she made findings of fact with respect to what representations have been made by counsel, right? That's correct, that's correct, Your Honor. So what's your standard of review here? Clearly erroneous? No, I believe it's still a de novo review because... Excuse me, I'm sorry. Sorry. But her findings as to what the lawyer told Mr. Hall is a finding of fact, is that correct? It is, but whether the defendant used statements from the plea contract at trial, apparently is a de novo review. And it could be in part because we're looking at, again, the fundamental right of a trial. This is exactly the kind of situation that Rule 410 is kind of designed to protect, where a defendant maybe makes some statements in plea to do this, whether there's a mistake or whether there's additional evidence that comes out, but he has to change his mind. And so when the court allows the government to rely on that waiver and allows that evidence against the defendant at the trial, boy, is that prejudicial. There is not much more prejudicial than a confession. It's a defense lawyer's nightmare. And so without that confession, with the facts of this particular case, the possession of gun and drugs by Mr. Hall was pretty questionable. It very well could have been accidental, and there was a defense witness, Ms. Merwin, his girlfriend, who had a very reasonable explanation for it. And so without the confession, it's very, very unlikely that the defendant would have secured an acquittal in that situation. The other interesting facts from this case have to do with an incident that occurred to a juror. I believe it was following the close of the defense case and before closing arguments. And as the jurors left for the day, one juror got in her car and she saw the only defense witness, the defendant, and apparently followed her down a busy or thoroughfare in Cedar Rapids, maybe a couple of miles. It might have been, probably was, just a coincidence. But this juror comes to court then the next day and talks to the other jurors about it, and she is upset, disturbed enough, and so are the other jurors, disturbed enough that they requested an escort to their cars. Wait a second. All the jurors requested an escort? That's my understanding of what went on. I thought it was just this woman. They questioned just this woman in open court, but from... What's the evidence, besides what happened in open court, on which you rely for your statement? That the other jurors... It was a statement by one of the government lawyers about a conversation with a CSO. Okay. It was sort of double hearsay, but beyond that, there's no... I don't see any real evidence that you can point to that the jurors, in the plural, were in any way affected by this event. I think the concern is that she had not kept it to herself. If she had kept it to herself, it might have been alleviated just by a conversation with her in open court, or even a little bit of fact-finding and explaining to her, oh, that person lives right near you, or something like that. But she had discussed it with the other jurors, and I believe they were allowed to have an escort to their cars. But I can take a look at the record while I'm waiting for counsel to finish her argument. At some point, the court gave a cautionary instruction? That's correct. Wasn't that agreed to by defense? It was negotiated between the defense and the prosecution. However, the defense had made a motion for mistrial, renewed the motion for mistrial. Under the circumstances, that's probably about the best that trial counsel could do, would be to negotiate with the cautionary instruction. This court's decision... That's not a waiver of the mistrial motion, is that what you're saying? Yeah, I don't think it would be. We're just saying we want a mistrial, we don't want an instruction, but if you're going to give one, this is about as good as we could ask for. Better than keeping your mouth shut and letting the cautionary instruction be weak, I suppose. So this court would then have to decide whether a cautionary instruction, and it wasn't bad. It directly addressed the very situation that was the concern there. But was that enough to alleviate the prejudice? There, again, when we're talking something about safety of jurors, where a juror's emotions are going to be coming into play, it really, really starts to disturb some of the assumptions and guarantees that we have for a fair trial for a defendant. If he's denied an impartial jury, if he's denied a fair trial, obviously those are constitutional issues. The juror that brought this to the attention of the court that expressed a concern, doesn't the record show that that juror was satisfied and stated that it was he or she, that they were satisfied and were no longer concerned and could continue? I think a dry read of the transcript does appear to say that. But again, when we're talking about something as serious as having an impartial jury or having a jury that might be swayed by their fears, we need to take a closer look. Counsel, have you given thought to the relevance of our recent decision in the United States v. Harris-Thompson, which involved rather remarkably similar facts on the same district judge, and if anything, a more difficult juror situation to resolve? Your Honor, I was not aware of that decision, but if the court would like, I can certainly submit a 38-J letter. I don't request any. The cite is 751 F 3rd 590. Thank you. So then the last two issues that are briefed are somewhat similar. The defendant was, again, scored as a career offender and an armed career criminal in the final, final, final PSI, and he was allowed to make his objections, which were overruled by the district court. The law under Mathis is continuously evolving, but it appears that this particular law in Texas of robbery does have a lower level of conduct that can support a conviction that's below the level of a violent force or a violent felony. And so the position of the defense is that it's not a crime of violence for purposes of a career offender, and because the language under a career offender is so similar to the armed career criminal, they're treated virtually identically, it's also not a violent felony for purposes of an armed career criminal. The Texas statute talks about intentionally, knowingly, or recklessly causing bodily injury to another, and that's not the same thing as intentional or knowing infliction of bodily injury, and also the focus on physical force. Of course, prior cases clarify that physical force means force capable of causing physical pain or injury to another person, and the traditional view of this would be one person touching another or using an instrument of lethality against another. It would seem that under the Texas statute it's possible for someone to, for example, steal fuel oil, barrels of fuel oil from a manufacturing company, spill some of the fuel oil the next morning, somebody comes in and slips and falls. Did they cause an injury? Yes. Is that the kind of thing that violent force matches? No. Likewise, if a person breaks into his ex-wife's house, takes property, and then leaves a threatening note that I'm going to be coming over for you in the next couple of days, that's not an immediate harm. And so, again, it would be possible to be convicted of robbery under the Texas Code section and yet not be a violent force situation that triggers the Career Offender or Armed Career Criminal Act. Finally, the other felonies that were relied upon by the court, there were two charges alleged in one charging instrument trial information of delivery of narcotics, and the two were based on something that occurred within one day of each other. I think there was two controlled buys. The defendant was convicted of both of those, and they're both drug felonies, but it's in the same charging instrument. It was not separated by an arrest. The sentences were imposed on the same day. So they should not count as separate convictions for purposes of these enhancements. I'd like to reserve the rest of my time for rebuttal, if possible. Ms. Williams. May it please the court, counsel, Lisa Williams here again, representing the United States. I would like to briefly address the juror issue, and I think the difficulty on issues like this is trying to transport this court into the courtroom so that you can understand the demeanor and character of the juror when she's telling the court about this. And, of course, on a dry record, that's hard to do. But I would note that what was said after the hearing by myself, by the government, I said, I think what is not captured on the record was her demeanor. She seemed very casual. She was not nervous. She was not upset. And then Judge Reed said, I agree with Ms. Williams. Even the juror indicated that it was probably just somebody going in the same direction. And so when we're evaluating the impact that this incident had on the juror, it was slight. Yes, she requested an escort to her car the next night. And I will say, I think the confusion about who requested the escort is because during the questioning, the juror said, I mentioned that I felt a little nervous and asked if they would walk us to our car tonight. And so that us, that plural, seems to suggest that maybe she was asking if all of the jurors could be escorted to the car. And I think that's where the confusion . . . That's different from all the jurors asking to be escorted. It is very . . . That was my point. Yes, Your Honor, it is very different. But I think that's where the confusion about who was asking for what. I think she was asking on behalf of the jury pool, not that all of the jurors suddenly thought that this was such an issue that they needed an escort. But I strongly disagree with counsel's characterization of the evidence, turning to the 410 waiver issue of this case, without the signed stipulation of facts. This was a strong case, even without the written confession. This is a traffic stop where he tried to flee from the officers, get away from the car. He actually assaulted one of the officers by punching him in the face. He sent a text message to his girlfriend that said, you've got to come down here, I'm dirty. The gun and marijuana were in the center console, right next to where he was driving. And then on his phone, there was a Facebook video of him mixing up a drink. And right next to that drink was a gun that appeared identical to the gun that was found in the car. In fact, Special Agent O'Brien's testimony at trial was he was not . . . Counsel, why isn't his flight a reflection of the marijuana they'd apparently been smoking? It could be of the marijuana he was smoking, but Officer Hebert testified that in a case where someone is facing lesser misdemeanor charges, the degree of flight that he exhibited would have been unusual. The fact that he punched the officer in the face is really an extraordinary attempt to get away from the car that in Officer Hebert's experience he didn't typically associate with people who had . . . who were driving without a license or facing lesser charges, that he thought that it was indicative of more serious. I must say, if the defense . . . the defendant's brief says that he and Ms. Merwin had gone to great efforts because they knew that he shouldn't be in possession of her guns, and since he was aware of the risk, I'm not surprised he fled when he realized or the state that the police discovered that what they were done with was in the console. I hear an argument that is not all that persuasive to me. His flight took place, Your Honor, prior to the police discovering the firearm in the car. Well, but . . . all right, so he may have known it. That would be the government's argument, that he knew that that firearm was in the vehicle and that's why he fled. But if he had said, uh-oh, geez, I'm driving her car. I wonder if the gun's in there. I'm in trouble. I've got to get out of here. I would note that the . . . That would be a logical flight that's not inconsistent with not knowing possession. Your point is well taken, but it's not as strong as you're suggesting, in my view. I think that we agree on that point, Your Honor. I would return to the video, though, because I do think that this video is strong evidence. He's mixing a drink, and the firearm that appears identical to the gun in the car is sitting on the table. And the video is showing somebody mixing a drink, and then he turns the camera onto his face and speaks into the camera. And so you know by this video that he's within inches of this fire, of what appears to be the identical firearm, on a different occasion. And when you have that type of possession evidence combined with the knowledge, perhaps, that his flight shows that the gun is in the car, I think that is strong evidence of knowing possession of the firearm. I would also note that when it was found in the car, it was seized next to 64 individually wrapped bags of marijuana. And I believe that Ms. Merwin testified that she does not deal marijuana, and that she does not have anything to do with distributing marijuana. So then you have his knowledge of the gun next to his marijuana. And then you tie in the expert testimony from Special Agent Magers about how firearms are tools of the trade for drug dealers. And they carry them to protect their drugs and their cash. And then I think that there is, in light of all of that, a very strong, strong case that he possessed that gun absent the stipulation of facts. Turning to... Quick question on the jury issue. Am I right to assume that the government thinks Harris-Thompson is not relevant because he didn't cite the case? Your Honor, I have to apologize. I can't comment on Harris-Thompson. I also have not reviewed that case, and I know it's from my district. And so I can't comment on the relevancy of it to this appeal. Yeah, it's hard to believe you could research this juror issue in this district without finding that. But never mind. I think I'd like to turn to the guidelines issue and the ACCA issue next. The government does not see this as a Mathis issue. The government's position is no matter how you... It's categorically a crime of violence. No matter how you violate the Texas robbery statute, it is a crime of violence. And so we don't need to get into Mathis and whether these are elements and whether it's divisible. This is categorically a crime of violence. Putting aside whether it's a crime of violence under the use prong, what's interesting about this case is that the court can reach the issue under the guidelines calculation. By the time Mr. Hall was sentenced, the residual clause was out of the guidelines. And robbery is an enumerated offense. Now, the government agrees that you can't use that enumerated offense against Mr. Hall under the ex post facto rule. But what the rule is, the one book rule, is that you then go back and use the guidelines manual in effect at the time Mr. Hall committed his crime, which is the pre-August 2016 edition, which did contain the residual clause. And under Beckles, that residual clause is still good. And so to reach whether or not this robbery crime is a crime of violence, this court can analyze it under the residual clause analysis. So you can put Mathis aside. You can put does it involve the threatened use of force. You can set all of that aside and look at the law on does robbery in Texas fit into that residual clause. And there are Fifth Circuit cases back, cited in the governance brief, I believe it's from 2007, interpreting it and finding that, yes, this robbery is a crime of violence under the residual clause. If the court finds that, then he has the one other controlled substance offense. Because of the 924C, he guidelines out at a 360 to life. And, of course, Judge Reed sentenced him to 360 months at the bottom of the advisory guideline range. And under that analysis, the court should uphold the conviction. If the court wants to analyze it under the use prong, either in the ACCA or the use prong in the guidelines, I still think that the court reaches the conclusion that it is a crime of violence. In Texas, you have two different ways to commit a robbery. The first one is intentionally, knowingly, or recklessly causing injury, causing bodily injury. And I think that there's a long line of cases out of the Eighth Circuit that says if you actually cause bodily injury, then that is the use of force. I would spend a moment talking about the reckless standard. I think that under Wazin, even though in Texas you can recklessly cause bodily injury, that does not change the analysis at all because Wazin stands for the proposition that even if you recklessly cause an injury, you're still using force no less than someone who knowingly or intentionally causes that injury. So under the first prong, it meets the force test. The second prong is just intentional or knowingly threatening or placing in fear another of bodily injury, which too fits into the use analysis. I know that counsel stood up and gave some hypotheticals of how somebody could be convicted under Texas in this law. I don't believe that those are actual cases. I think our case law is clear that it has to be more than mere fanciful speculation, but more there has to be a showing that this is how Texas courts interpret the crime, and I don't think we have that in this case. I think with respect to the rest of the use of force issues, I believe that the government briefed it. The Fifth Circuit interpretation of using force is not applicable in our district. The Villa-Hernandez decision cited by the defense talks about the concern with, well, you could give somebody a poison drink and that would cause them harm, and so we don't consider that. We have squarely rejected that analysis, and Rice and Castleman, in fact, is the first to really say that that's not the right way to look at that. So I don't think that the Fifth Circuit decisions cited in the defense brief are applicable here. I would instead rely on Schaefer and Rice and Solito-Rosas as the threatened use of force and how we interpret those in this circuit. And unless there are questions from the panel, I will, again, rest on the rest of the government's briefing. Thank you. How much time does counsel have remaining? Two minutes. About two minutes. You may proceed. Thank you, Your Honor. On the issue of the potentially threatened juror, I'm looking at the transcript of pages 10 to, I guess, 13, and the transcript is called Excerpt of Jury Trial Proceedings on June 14th, so in the middle of the trial. The court questioning the individual juror said, okay, so she didn't say anything or she didn't make any gesture to you, and the juror said, no, it was probably nothing. But she also has said, I was just a little nervous. The court said, anything about that that would keep you from being fair and impartial when you make your decisions on this case? And the juror said, no. Then the court asked, when you had this occur, did you talk to any of the other jurors about it? And the juror said, just this morning. And the court said, well, what did you say to them? And the juror replied, I just mentioned that I felt a little nervous. And the court said, okay. And the juror continued and asked if they would walk us to our car tonight. So the court asked, other jurors heard you say that? And the juror said, yes. And then, continuing over to page 13, this is counsel for the government stating, she apparently spoke to some of the jurors about it, but the event happened to her. So this juror feels comfortable and fine that it's not a big deal. I see no way that the other jurors would think that it's a bigger deal since it didn't personally happen to them. And then defense counsel says, well, what I guess concerns me is that the jurors asked for security from the courthouse to the parking lot. So that's where I took the assumption. Could you repeat that last sentence, please? This was defense counsel's statement. Well, I guess what concerns me is that the jurors asked for security from the courthouse to the parking lot after the case today. I'm not sure it's clear, but I wanted to. That's what he said. That's what he said, but the problem is that the juror had spoken with the other jurors about it. And I don't know that we can go so far as to assume that the other jurors would be less of a problem with it since it didn't personally happen to them. If they heard about something like that, they could very well be more upset. And again, we don't really know who asked for security to take them to their cars. It sounds like perhaps it was just that juror, but in the presence of the other jurors and a question of maybe the CSOs or something. I see I'm out of time. Thank you. Thank you, counsel. Thank you, counsel. The case is submitted. You may stand aside.